UNITED STATES DISTRICT COURT NORTHERN DISTRICK OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| ISABELLA NARTEY, | ) Case No.: 1:18-cv-05327 |
| Plaintiff | ) AMENDED COMPLAINT |
| v. | ) JUDGE S. JOHNSON COLEMAN |
| FRANCISCAN HEALTH, | ) |
| Defendant | ) JURY TRIAL DEMANDED |
| | ) |

_____

Isabella Nartey (Nartey) - pro se, plaintiff – in her complaint against defendant – Franciscan Health Olympia Fields (Franciscan)– alleges as follows:

INTRODUCTION

1.   This case involves a claims under 42 U.S. Code § 1395dd - the Emergency Medical Treatment and Active Labor Act (EMTALA) – for  Franciscan's August 2016 violations of EMTALA resulting in the clinical brain death and subsequent physical death of Nartey's mother, Millicent Nartey.

2.      Among other acts and omissions Franciscan Health Olympia Fields (Franciscan) failed to transfer to Millicent Nartey (Millicent) to a comprehensive stroke center or primary stroke center as (1) required by EMTALA's mandate that all individuals presenting at hospital's emergency department be screened and stabilized for transfer if care that leads to stabilization is not available on site and (2) mandated by Franciscan's status with the state of Illinois as an Acute Stroke Ready Hospital (ASRH).

3.      This case also involves violations of Title VI of the Civil Rights Act of 1964 – 42 USC Section 2000d – since Franciscan Health, which receives federal financial assistance in the

form of Medicaid/Medicare,  did not take reasonable steps to make their programs, services, and activities available to Millicent Nartey who spoke multiple languages and had limited English proficiency.

4.      This case also involves violations of HIPPA since Franciscan Health, which receives federal financial assistance in the form of Medicaid/Medicare, by various acts and omissions withheld, misconstrued and concealed information that had Millicent, her representatives, or Nartey been allowed access to would have allowed Millicent to alter the course of her care via informed consent and discharge/hospital transfer planning.  Franciscan's acts and omissions in relation to their HIPPA violations, which compound their EMTALA violations, denied Millicent her right as a medical patient to give informed consent and resulted in Millicent experiencing medical battery and excessive medical billing among the other damages suffered.

5.      This Court has the jurisdiction under 28 U.S. Code § 1331, 28 U.S. Code § 1343, and 42 U.S. Code § 1395dd (d). Nartey asserts claims under EMTALA and Title Vi of the Civil Rights Act of 1964, 42 US Code § 2000 d. This Court also has jurisdiction over any state law claims under 28 U.S. Code §1367.

6. Venue is proper under this judicial district, pursuant to 28 USC  §  1391, since Franciscan Health resides in this judicial district and since the events and omissions giving rise to Nartey's claims occurred in this judicial district.

PARTIES

7.      Plaintiff, pro se, Isabella Nartey (Nartey) is the daughter of Millicent Nartey (Millicent) – African American female, age 61 - who was declared clinically brain dead at Cook County's Franciscan Health of Olympia Fields (Franciscan) on August 16, 2016 and was then disconnected from all life support at Franciscan on August 19, 2016.

8.      Nartey originally filed a small estate affidavit in the 12th judicial district Will County as per Illinois law. Nartey, pursuant to the Honorable Sharon Johnson Coleman's direction, filed a petition to be appointed Administrator of The Estate of Millicent Nartey (case n.o. 18P1102 in the 12th judicial circuit court Will County IL).

9.      Millicent's heirs - her surviving spouse (Nartey's father) and children (Nartey's siblings) have no objections to documents executed and have provided affidavits stating such. The 12th district court set the hearing on Nartey's appointment as administrator of Millicent Nartey's estate for March 20, 2019.

10.     Defendant, Franciscan, is a business incorporated as FRANCISCAN ALLIANCE INC, is an Indiana-based corporation, doing business in Olympia Fields, IL (Cook County) under the name of Franciscan Health Olympia Fields and operating as a hospital as set forth in the records at IL Secretary of State. Therefore, Franciscan is governed by and can be held liable for any damages caused by violations of and deviations from all state and federal statues regarding hospital protocol, patient's rights, HIPPA, Civil Rights, and care standards for pandemic health conditions.

11.     During the August 2016 events in this complaint, Franciscan was licensed with the state of Illinois as an acute stroke ready hospital (ASRH), per 210 ILCS 50. 210 ILCS 50/3.117 makes it clear any hospital with this designation must meet and maintain the following criteria in order to remain registered with the ASRH designation:

      a.                      Create written acute care protocols related to emergent stroke care & participate in the data collection system provided in Section 3.118, if available

      b. Maintain a <u>written transfer agreement</u> with one or more hospitals that have <u>neurosurgical</u> <u>expertise</u>

      c. Designate a Clinical Director of Stroke Care who shall be a clinical member of the hospital staff with training or experience, as defined by the facility, in the care of

patients with cerebrovascular disease (i.e. stroke, vascular dementia, TIA, subarachnoid hemorrhage) AND provide rapid access to an acute stroke team, as defined by the facility that considers and reflects nationally-recognized, evidence-based protocols or guidelines.

    d. Administer thrombolytic therapy, <u>or</u> subsequently developed medical therapies that meet nationally recognized, evidence-based stroke guidelines.

    e. Conduct brain image tests at all times.

    f. Conduct blood coagulation studies at all times.

    g. Maintain a log of stroke patients, which shall be available for review upon request by the Department (of Public Health) or any hospital that has a written transfer agreement with the Acute Stroke-Ready Hospital.

    h. <u>Admit</u> stroke patients to a unit that can provide appropriate care that can provide appropriate care that considers and reflects nationally-recognized, evidence-based protocols or guidelines <u>or transfer stroke patients</u> to an Acute Stroke Ready Hospital, a <u>Primary Stroke Center</u>, a <u>Comprehensive Stroke Center</u>, or <u>another facility that can provide the appropriate care</u> that considers and reflects nationally-recognized, evidence-based protocols or guidelines; and

    i. Demonstrate compliance with nationally-recognized quality indicators

12.    Therefore, Franciscan – being governed by this statute regarding the proper care of stroke victims and those with a stroke pending – can be held liable for any damages caused by violation of and deviations from this statue.

13.    Also, in August 2016, Franciscan Health was a Medicare/Medicaid participating hospital with a defined emergency department and was, therefore, governed by EMTALA and liable for any damages caused by EMTALA violations.

14.     Under EMTALA, any person who seeks emergency medical care at a covered facility, regardless of ability to pay or any other characteristic, is guaranteed an appropriate medical screening exam to identify all emergency medical conditions connected to their presenting symptoms and, if an emergency medical condition exists, said individual is guaranteed access to the medical treatment that will stabilize their emergency medical condition whether that care be issued at the current hospital location or via a transfer to a specialized care medical facility that can deliver the type and level of care that will stabilize their emergency medical condition.

15.     The EMTALA rules make clear that hospitals are obligated to provide the screening services necessary to determine whether or not an emergency medical condition exists and that hospitals are allowed (pursuant to section 1135(b) of the Social Security Act to direct an individual to receive medical screening examination at an alternate location if that redirection follows a state authorized pandemic preparedness plan. (Note: Illinois' Primary Stroke Act - which authorizes the transfer of stroke and suspected stroke patients to primary/comprehensive stroke centers for screening and stabilization - does qualify as a pandemic preparedness plan since stroke is both a prevalent and pervasive disease nationwide.)

16.     Per EMTALA, if an emergency medical condition does exist, the hospital is then required to stabilize each emergency medical condition identified or transfer the individual – via a doctor's approval or the patient's request – to a medical facility that does have the specialized expertise and technological advancements to deliver the life-saving care and stabilize the individual.

17.     Additionally, per the 2003 update to EMTALA rules [see 42 CFR sec 489.24 (d)(2) 68Fed. Reg. 53222] further clarify that stabilization duty does not end upon inpatient admission if the inpatient admission was done in bad faith on the part of the hospital.

**FACTS**

18.     On the afternoon of August 3, 2016, Nartey called 911 since her mother, Millicent Nartey, expressed alarm stating that she had a sudden, decreased ability to support her weight on her right leg as she was waking from a midday nap. Nartey also alerted her two siblings in Illinois – Millicent's children - and her dad, Millicent's spouse.

19.     Shortly thereafter, approximately 2:30 p.m. on the afternoon of August 3, 2016, the paramedics arrived at Millicent's residence. The paramedics recorded Millicent to be alert with an elevated blood pressure of 170/90 and recommended she be taken to the nearest hospital for further evaluation.

20.     The paramedics advised that Franciscan Health – located at South Crawford Ave, Olympia Fields, IL 60461 - was the nearest hospital and that one family member could accompany Millicent in the ambulance if desired.

21.     Millicent's spouse chose to ride in the ambulance with Millicent. Nartey witnessed the ambulance depart from Millicent's residence with its lights flashing and siren on before shortly before 3:00 p.m. on August 3, 2016. Nartey then drove herself to the Franciscan.

22.     When Nartey arrived at Franciscan Health's property on August 3, 2016, she learned that Millicent's son, husband, third daughter were already on site and that Millicent had already been transferred from the ambulance into Franciscan's emergency department. Nartey's brother met her near the lobby of Franciscan's emergency department and escorted her to Millicent Nartey's exam room.

23.     Upon entering Millicent's room in Franciscan's emergency department around 3:15 p.m. on August 3, 2016, Nartey observed that although her mom, Millicent, was conversing with family and responding to questions from the medical staff, that Millicent's breathing had

changed and her blood pressure was rising alarmingly fast, with the systolic number registering over 200 more than once.

24.     While in the Franciscan Health emergency department room on August 3, 2016, Millicent Nartey and her family responded to the questions of the Franciscan Health emergency medical team.

25.     Nartey and the family alerted the Franciscan Health emergency medical team of Millicent's past experiences with high blood pressure and that while her blood pressure often rose under duress, it had never been this high. Millicent, Nartey and the family members present also alerted the Franciscan Health emergency medical team of Millicent's past allergic reactions and side effects experienced while taking the pharmaceuticals prescribed to control her high blood pressure.

26.     Nartey witnessed both Millicent and Millicent's husband tell the Franciscan Health emergency medical team that, because of the disruptive side effects experienced while on pharmaceutical drugs, Millicent had chosen to manage her blood pressure with dietary changes, lifestyle adjustments, and natural remedies.

27.     Nartey did not witness the Franciscan Health emergency medical team write down or record any of the information as it was provided it.

18.     On August 3, 2016, after an hour or so in the emergency department, Franciscan Health's emergency medical team alerted Millicent, Nartey and the family present that Millicent's potassium levels were low and that the low potassium levels were probably responsible for the reported weakness in her right leg.

29.     Franciscan Health's emergency medical team also told Millicent and her family that there was some damage to Millicent's heart and said that this type of damage was fairly common in people with uncontrolled or poorly regulated high blood pressure.

30.     Finally, Franciscan Health's emergency medical team told Millicent, Nartey, and the family that Millicent's blood pressure was alarmingly high and Millicent would need to be kept for overnight observation in Franciscan Health's intensive care unit (ICU) to prevent a stroke.

31.     Additionally, while still in the Franciscan Health emergency room on August 3, 2016, the Franciscan Health emergency medical team informed Nartey and the family present that while relatives would be able to visit with Millicent in ICU later that evening, the Franciscan Health's medical team needed at least an hour to run more tests. When Millicent's family asked when they would know the results of the tests, the nurse on duty in the emergency department advised that all test results, including that of Millicent's CT scan, would be shared in the morning along with Franciscan Health's options for Millicent Nartey's care.

32.     With this information, Nartey and her sister, Rosalita, went to ICU the August 3, 2016 to find a member of the Franciscan Health medical team assigned to Millicent.

33.     Nartey and Rosalita found a nurse and Nartey witnessed Rosalita tell the Franciscan nurse that English was not Millicent Nartey's first or native language. When asked the name of Millicent's native language, Rosalita responded that it was a West African language by the name of TWI; that Millicent was also fluent in the West African language of GHA, and that family members were available to translate any information into those languages as the need arose.

34.     Nartey also witnessed Rosalita tell Franciscan's ICU nurse that while Millicent Nartey could usually understand and respond English in normal situations, since Millicent Nartey was

under distress, the Franciscan Health medical team may need to speak more slowly or more calmly for Millicent Nartey to engage/respond.

The nurse said he understood and would alert the rest of the ICU team as well.

35.　　Nartey and her sister, Rosalita, returned to ICU shortly thereafter on August 3, 2016. The nurse on duty told them that Millicent Nartey had been calling out and seemed to be in great distress when she came on duty, but that Millicent had calmed down after the nurse diluted the potassium entering her hand by IV. Nartey and Rosalita comforted Millicent with music and conversation until she fell asleep.

36.　　On the morning of August 4, 2016, Nartey and Rosalita, were in Millicent's room with her when a male doctor arrived with a team of Franciscan Health resident doctors.

37.　　The male doctor introduced himself as Dr. Jain, stated that he was the head of Millicent's care plan at Franciscan Health, and that his speciality was pulmology.  Dr. Jain also stated that Franciscan Health was a teaching hospital and that while he was not on site every day, any of the resident doctors could assist with questions or reach him if the need arose.

38.　　Shortly thereafter on the morning of August 4, 2016, Nartey witnessed Dr. Jain performed several exams to test Millicent Nartey's engagement and response in the presence of Nartey, Rosalita, and the team of resident doctors.

39.　　Dr. Jain then informed Nartey, Millicent, Rosalita, and the team of resident doctors that the CT scan performed in Franciscan Health emergency room showed no signs of stroke. He also informed the room that based on the results of other tests completed at Franciscan, Millicent was trending towards a stroke.

40.     On August 5, 2016, Dr. Jain then asked if Nartey and Rosalita would consider authorizing a trach for Millicent.  When asked, Dr. Jain explained that the invasive trach would not assist in "preventing a stroke" or managing any of Millicent's stroke-like symptoms, but would guarantee nourishment and ease Millicent's ability to participate in physical therapy in the event of a stroke.

41.     Nartey and Rosalita declined the trach and asked Dr. Jain about the necessary steps to clear Millicent for discharge.

42.     Dr. Jain explained that further testing would be necessary before Millicent could be discharged as her care plan would need to change if Millicent did, in fact, suffer a stroke. Dr. Jain ordered a swallow test for Millicent.

43.     Nartey and Rosalita phoned Millicent's husband to alert him of the morning's updates. He reminded Nartey to instruct Franciscan staff to be alert as they dropped Millicent's blood pressure since dropping one's blood pressure too quickly could also introduce complications.

44.     Nartey and Rosalita requested banana baby food/pudding or any flavor other than applesauce since Millicent hated applesauce. Franciscan Health dietician said the swallow test had to be done with the applesauce since that is what was approved by Franciscan Health.

45.     Millicent did not allow the dietician to place applesauce in her mouth and was then put on no food/no water dietary restrictions.

46.     The Franciscan Health medical team on duty informed Nartey and her sister that the brain tissue observed in Millicent's second CT scan differed significantly enough from the observations in Millicent's August 3, 2016 CT scan and that Millicent could not be discharged to go home.

47.     On the morning of August 5, 2016, Millicent Nartey was noticeably weaker, but asked – in English - to leave Franciscan Health while Nartey, Rosalita, and Franciscan Health nurse with glasses were in the room.

48.     Nartey responded something soothing and Millicent Nartey then burst into tears and repeated her request to leave in English through her sobs stating that "they're not helping me here."

49.     Nartey made eye contact with both Rosalita and the nurse in the room. Franciscan Health medical staff repeated that they were still running tests to determine why her right leg's condition had not yet improved and why her blood pressure was still elevated despite the continuous IV medication.

50.     The Franciscan Health nurse said that once Millicent Nartey was stable enough to leave ICU, she would spend a few days in the hospital's regular ward before going home just to ensure that there would not be a similar crisis at home.

51.     A female resident doctor called Millicent Nartey's husband regarding his power of attorney so as to obtain permission for the MRI and the required anesthesia.

52.     Nartey witnessed the resident doctor record Millicent's spouse give consent on Millicent's behalf by phone for both the MRI and the anesthesia. The MRI was performed on August 6, 2016.

53.     On the evening on August 6, 2016, a female resident doctor advised the plaintiff and her sister that the MRI went well, but that the Franciscan Health anesthesiologist gave Millicent

more than the legal dose of anesthesia because she woke up during the MRI and the Franciscan Health team had to the MRI start over.

54.     The Franciscan Health resident doctor informed Nartey and Rosalita to keep an eye on Millicent and alert Franciscan Health if Millicent Nartey did not seem to return to normal.

55.     Also, on August 5, 2016, Franciscan Health's nurses attempted to insert the feeding tube while Millicent was still unconscious from the MRI anesthesia.

56.     Millicent awoke, yelling, and used both hands to block their efforts. Franciscan Health's nurses requested the plaintiff's sister, Rosalita, to be in the room to calm Millicent Nartey and used  wrist restraints to get the feeding tube inserted against Millicent Nartey's wishes.

57.     After crying for an hour with her daughters by her side, Millicent got quiet and seemed to fall asleep.

58.     The Franciscan Health nursing staff mentioned that resistance to a feeding was common and that the restraints would need to stay on Millicent, per Franciscan Health's policy, to make sure Millicent Nartey did not remove the feeding tube.

59.     As of 7:30p August 6, 2016, Millicent Nartey still had not received food or medicine via feeding tube as the Franciscan medical team had advised the family was necessary for her recovery.

60.     Distraught, Nartey followed up with the nurse on duty. Nearly an hour later, an equally distraught Rosalita requested to speak with the doctor in charge.

61.     A resident doctor arrived in Millicent's room. He listened, impatiently, to our concerns before abruptly expressing that the Franciscan team was short but was moving as quickly as possible.

62.     Millicent's food arrived before 10:00 pm and she was finally nourished by feeding tube.

63.     On the morning of August 6, 2016, Millicent Nartey still had not regained consciousness after the MRI.

64.     Franciscan Health medical staff told Nartey and Rosalita that all was well with Millicent Nartey's care since she was receiving nourishment via the feeding tube.

65.     Also, on the morning of August 7, 2016, the weekend neurologist at Franciscan Health explained to Nartey and her sister, Rosalita, that the MRI had revealed a severe ischemic stroke caused by the plaque build-up in one of Millicent's carotid arteries.

66.     When the plaintiff and her sister asked to see the MRI results, the neurologist said that it was in Millicent Nartey's medical records, but he could draw us a visual on a sheet of paper.

67.     The Franciscan Health neurologist did and explained that based on the severity of Millicent Nartey's brain damage, the best course of action was to wait and see if Millicent pulled through as patients sometimes do.

68.     When the plaintiff asked the Franciscan Health neurologist if Millicent Nartey would be best served by a hospital that specializes in stroke cases, he responded that all hospitals would be doing exactly what Franciscan Health was doing already so there was no point to go through the inconveniences caused by a hospital transfer.

69.     In early afternoon, plaintiff followed up with the nursing station to inquire about the process for hospital transfer.

70.     The nurses on duty advised Nartey that a doctor would first need to approve such a transfer and that once it was approved the family would fill out the transfer paperwork so that Franciscan Health could forward the paperwork to the new hospital for the new hospital's review of Millicent's case and Millicent's health insurance provider.

71.     Franciscan Health medical team on duty told Nartey and Rosalita that such a transfer would likely not be necessary since Millicent Nartey was already getting excellent care at Franciscan Health.

72.     Also, in early afternoon, Nartey inquired with the nurses on duty Franciscan's process for obtaining the results of Millicent's multiple imaging tests, namely the two CT scans and the MRI, during Millicent's hospitalization period.

73.     The Franciscan Health nurses on duty advised that Millicent Nartey's imaging tests would be included with her full medical records, which could be requested after Millicent's departure from Franciscan Health.

74.     Nartey observed Franciscan Health make no significant adjustments to Millicent's care plan. While Millicent Nartey did eventually regain consciousness – primarily at night – Nartey witnessed her mother's waking moments as those of extreme distress from being bound by the foam wrist restraints. During times of bedding change, Millicent would cry out that the feeding tube was hurting her as she was moved from side to side. Nartey and Rosalita did their best to keep the tube still increase Millicent's comfort, but were sometimes asked step aside.  One nurse, Jeanie, even scolded Millicent stating that she had ensured a feeding tube once and it did not hurt her so Millicent just needed to relax so she could get used to it. After witnessing

this, Nartey and Rosalita remained present to stabilize the feeding tube as often as possible during bedding changes and instructed the nurses to be gentler and with the rotation since this experience seemed to be traumatic for Millicent. Most of the nurses complied.

75.     Around 11:00 pm on August 8, 2016, Nartey witnessed Millicent's breathing slow to below 16 breaths per minute and notified the overnight nurse. The overnight nurse dismissed the change as part of the normal breathing shift that happens when a person is asleep.

76.     Near midnight on August 8, 2016, Nartey notified the night nurse again because Millicent's breathing was now below 13 breaths per minute. By the time the night nurse arrived in the room, Millicent Nartey's breathing was at 10 breaths per minute and Nartey was informed that Millicent was coding.

77.     As medical personnel swarmed Millicent's room, Nartey was escorted to the hallway where she called her sister (Rosalita), her brother (Harold), and her father (Maxwell) to come to the hospital.

78.     By 1:00am on August 9, 2016, Millicent Nartey was on full life support and four of her five heirs were on-site at Franciscan. Maxwell Nartey – Millicent's husband and Nartey's father - expressed his extreme displeasure at Franciscan's lack of transparency with Millicent's medications, recovery regimen and blood pressure protocol to Franciscan's medical staff on duty.

79.     When Maxwell repeated his previous concerns that Millicent's condition could actually be made worse by dropping her blood pressure too fast without addressing the plaque build-up, the doctor on duty repeated Franciscan's position that Millicent's current regimen was the most effective way forward to help her recover from her condition **(ischemic stroke with large vessel occlusion).**

80.     Shortly thereafter, Maxwell and Harold Nartey departed Franciscan Health. Rosalita and Nartey stayed on-site overnight.  No further health incidences were observed until 8/10/16 – 8/11/16 when Nartey and Rosalita where informed Millicent would need to be treated for pneumonia.

81.     The morning of August 11, 2016, Dr. Jain and a team of doctors informed Millicent Nartey's husband (Nartey's father) and family in a conference room setting that - since Millicent Nartey had significant plaque build-up and stenosis in both her heart's arteries and her carotid artery - Franciscan Health had exhausted all of their resources available.

82.     Nartey was not present at this meeting but was told that Dr. Jain further informed the family that Franciscan Health could only offer to continue to keep Millicent Nartey comfortable.

83.     During the August 11, 2016 meeting, Rosalita asked again about a hospital transfer. Dr. Jain said he would authorize the transfer if the family could provide a list of hospitals that they thought would help Millicent Nartey recover.

84.     The family complied and – after an online search at Millicent Nartey's bedside – provided the Franciscan Health nurses on duty with the names of University of Chicago, Loyola University, and other hospitals.

85.     After the Nartey family provided Franciscan Health with the hospital names and corresponding transfer paperwork on August 11, 2016, Franciscan Health medical staff informed the family that hospital policy was to only submit one request at a time.

86.     Nartey voiced concerns that Franciscan Health's one-at-a-time policy would introduce unnecessary delays in finding new care for Millicent, but was provided with no alternative. During the dates of August 12, 2016 and August 14, 2016 - that Franciscan Health medical

staff informed the Nartey and Rosalita that both University of Chicago and Loyola University accepted Millicent Nartey but later declined "for insurance reasons" and for "financial reasons" (respectively) before the transfer could be initiated.

87.     The family then submitted a transfer request to Cook County / Stroger hospital on August 14, 2016.

88.     On August 15, 2016 a Franciscan Health resident doctor informed Nartey and Rosalita that it was necessary to perform a brain death test also known as a brain apnea test no later than August 16, 2016, per Franciscan's legal team, in order to comply with existing standards of care.

89.     Nartey requested that since Millicent's husband could not be present for the apnea test, that Franciscan hold the results until Millicent Nartey's husband and then power of attorney could be present on August 17, 2016. Franciscan Health accommodated this request.

90.     On the afternoon of August 17, 2016, two Franciscan Health resident doctors – in the presence of a Franciscan Health case manager and three of Millicent Nartey's children (Adelrita, Isabella, & Rosalita Nartey) – informed Millicent's husband that Millicent Nartey's brain apnea test results forced them to declare her clinically brain dead.

91.     One of the Franciscan Health resident doctors further explained that this new clinical brain death diagnosis meant that Franciscan Health had to end all treatment options and transfer inquires.

92. In response to the family's questions on August 17, 2016, the male Franciscan Health resident doctor explained that questions about Millicent's previous care plan could not be answered without Dr. Jain or any of the other specialists on Millicent's care team present; that

he would check if a second brain apnea test could be done; and that Franciscan Health was listing the cause of death as stroke without requesting an autopsy for confirmation based on Millicent's symptom escalation and medical diagnoses since presenting at Franciscan's emergency department on August 3, 2016.

93.     During a July 2018 conversation with a friend, Nartey was alerted of EMTALA and began reviewing Millicent Nartey's medical records. Nartey then discovered several inconsistencies between Millicent Nartey's experiences at Franciscan Health and the patient's protections to ensure care for life-threatening conditions that EMTALA provides.

94.     Nartey filed her EMTALA complaint on August 3, 2016.

DAMAGES

95.     As a result of Franciscan's conduct, omissions, and wrongdoing, Nartey, Millicent Nartey, and the Estate of Millicent Nartey have suffered the following damages and injuries:

  a) *Medical bills from Franciscan Health and affiliates*

  b) *Hospitalization costs – if payment is still desired by collecting parties*

  c) *Medical expenses associated with all imaging tests, third-party procedures, and therapies (including all speech, occupational, and physical therapies) - if payment is still desired by collecting parties*

  d) *Missed time at work and loss of future earnings (Millicent Nartey).*

  e) Missed time income opportunities during the preparation of this complaint (Isabella Nartey).

  f) *Trauma endured by Millicent as a direct result of the physical restraint and increasing disability during August 5 – 17, 2016 under Franciscan Health's care plan.*

  g) *Pain, suffering, emotional trauma, and mental stress on Millicent Nartey resulting from the failure to stabilize the <u>emergency medical condition of heart attack</u> (non-STEMI) diagnosed in ER.*

h) *Pain, suffering, emotional trauma, and mental stress on Millicent Nartey resulting from congestive heart failure which developed per the failure to stabilize the emergency medical condition of heart attack, which was diagnosed in ER.*

i) *Pain, suffering, emotional trauma, and mental stress on Millicent Nartey resulting from the misdiagnosis of congestive heart failure as pneumonia.*

j) *Pain, suffering, emotional trauma, and mental stress on Millicent Nartey resulting from delayed medical screening exam of MRI once the patient was put on stroke alert in ER.*

k) *Pain, suffering, emotional trauma, and mental stress on Millicent Nartey resulting from delayed diagnosis of ischemic stroke with emergent large vessel occlusion even after being placed on stroke alert in ER.*

l) *Pain, suffering, emotional trauma, and mental stress on Millicent Nartey resulting from the with-holding of information regarding (1) diagnosis (2) all available treatment options (3) risks & benefits of each treatment option (4) patient's right – per EMTALA - to have her transfer requests (5) patient's right – per IL's stroke law – to be transferred to a primary or comprehensive stroke center once she had been placed on "stroke alert" in ER.*

m) *Pain, suffering, emotional trauma, and mental stress on Millicent Nartey due to the inability to provide informed consent (by either Millicent or her Power of Attorney) due to Franciscan's repeated withholding of information.*

n) *Pain, suffering, emotional trauma, and mental stress on Millicent Nartey due to the medical battery she endured as a result of her and her Power of Attorney at the time being unable to provide informed consent due to Franciscan's repeated withholding of information.*

o) *Pain, suffering, emotional trauma, and mental stress on Millicent Nartey resulting from the medical battery she endured with-holding of information which denied her and her Power of Attorney at the time the opportunity to provide informed consent.*

p) *Pain, suffering, emotional trauma, and mental stress on the Nartey Family ensured during Millicent's ER visit and subsequent hospitalization.*

q) *Millicent's loss of social experiences.*

r) *Millicent's loss of family experiences.*

s) *The Nartey family's loss of social experiences with Millicent (five heirs plus three living grandchildren).*

t) *The Nartey family's loss of family experiences with Millicent (five heirs and three living grandchildren).*

u) *Funeral expenses and burial costs associated with the clinical brain death as a result of Franciscan's failure to properly examine and stabilize Millicent when she presented in ER on August 3, 2016.*

v) Court costs and all fees associated with discovery, trial, mediation, and litigation personally incurred by plaintiff.

w) Attorneys fees, as applicable

x) Costs associated with obtaining medical records, independent medical reviews and personal securing expert witnesses.

CLAIMS

96.     Under EMTALA, any person who seeks emergency medical care at a covered facility, regardless of ability to pay or any other characteristic, is guaranteed an appropriate medical screening exam to identify all emergency medical conditions connected to their presenting symptoms and, if an emergency medical condition exists, said individual is guaranteed access to the medical treatment that will stabilize their emergency medical condition or a transfer to a specialized care medical facility that can deliver the type and level of care that will stabilize their emergency medical condition. Franciscan failed to meet its EMTALA obligations as follows:

**COUNT ONE: EMTALA VIOLATION 42 USC 1395 dd**
**MEDICAL SCREENING EXAM VIOLATION**

Nartey re-alleges and incorporates by reference paragraphs 1 - 95 inclusive in Franciscan's August 3, 2016 FAILURE TO PERFORM THE APPROPRIATE MEDICAL SCREENING

EXAMS FOR THE EMERGENCY MEDICAL CONDITION OF **CARDIAC CT FOR CALCIUM SCORING** FOR THE ACUTE LIFE-THREATENING HEALTH CONDITION OF HEART ATTACK even though they mentioned Millicent's heart damage to the family. Without the appropriate medical screening exam, the Franciscan emergency team on duty could not implement a treatment plan that would actually stabilize the Millicent Nartey. Both Millicent and Nartey (plaintiff) both suffered damages as a result of these violations.

## COUNT TWO: EMTALA VIOLATION 42 USC 1395 dd
## MEDICAL SCREENING EXAM VIOLATION

Nartey re-alleges and incorporates by reference paragraphs 1 - 95 inclusive in Franciscan's August 3, 2016 FAILURE TO PERFORM AN APPROPRIATE MEDICAL SCREENING EXAM OF **CORONARY CT ANGIOGRAPHY** FOR THE ACUTE LIFE-THREATENING HEALTH CONDITION OF HEART ATTACK. Without the appropriate medical screening exam, the Franciscan emergency team on duty could not implement a treatment plan that would actually stabilize the Millicent Nartey. Both Millicent and Nartey (plaintiff) both suffered damages as a result of these violations.

## COUNT THREE: EMTALA VIOLATION 42 USC 1395 dd
## MEDICAL SCREENING EXAM VIOLATION RE: HEART ATTACK

Nartey re-alleges and incorporates by reference paragraphs 1 - 95 inclusive in Franciscan's August 3, 2016 FAILURE TO PERFORM AN APPROPRIATE MEDICAL SCREENING EXAM OF **CORONARY CATHETHAR ANGIOGRAPHY** FOR THE ACUTE LIFE-THREATENING HEALTH CONDITION OF HEART ATTACK. Without the appropriate medical screening exam, the Franciscan emergency team on duty could not implement a treatment plan that would actually stabilize the Millicent Nartey. Both Millicent and Nartey (plaintiff) both suffered damages as a result of these violations.

**COUNT FOUR: EMTALA VIOLATION 42 USC 1395 dd**

**8/3/16 MEDICAL SCREENING EXAM VIOLATION RE: STROKE**

Nartey re-alleges and incorporates by reference paragraphs 1 - 95 inclusive in Franciscan's August 3, 2016 FAILURE TO PERFORM AN APPROPRIATE MEDICAL SCREENING EXAM OF **MAGNETIC RESONANCE IMAGING (MRI)** FOR THE ACUTE LIFE-THREATENING HEALTH CONDITION OF **STROKE**. The Franciscan emergency medical team had access to Millicent's CT scan results which both recommended an MRI. The Franciscan stroke alert team and emergency department team also noted decline was forseeable in 8/3/16 medical records, yet still did not request or complete an MRI while Millicent was still in the emergency department. Without the appropriate medical screening exam, the Franciscan emergency team on duty could not implement a treatment plan that would actually stabilize the Millicent Nartey. Both Millicent and Nartey (plaintiff) both suffered damages as a result of these violations.

**COUNT FIVE: EMTALA VIOLATION 42 USC 1395 dd**

**8/4/16 MEDICAL SCREENING EXAM VIOLATION RE: STROKE**

Nartey re-alleges and incorporates by reference paragraphs 1 - 95 inclusive in Franciscan's August 4, 2016 FAILURE TO PERFORM AN APPROPRIATE MEDICAL SCREENING EXAM OF **MAGNETIC RESONANCE IMAGING (MRI)** FOR THE ACUTE LIFE-THREATENING HEALTH CONDITION OF **STROKE while Millicent was under observation in Franciscan's ICU**.

The Franciscan medical team had access to Millicent's 8/3/16 medical records which included the CT scan results, the recommendation for an MRI, and the Franciscan stroke alert team and emergency department team's notations that decline was foreseeable. Yet, the 8/4/16 Franciscan medical team authorized only another CT scan, which did show significant brain changes, before then alerting Nartey and family that Millicent would be admitted so that an

MRI could be conducted on 8/5/16. Without the appropriate medical screening exam, the Franciscan emergency team on duty could not implement a treatment plan that would actually stabilize the Millicent Nartey. Both Millicent and Nartey (plaintiff) both suffered damages as a result of these violations.

**COUNT SIX: EMTALA VIOLATION 42 USC 1395 dd**

**8/3/16 FAILURE TO STABILIZE re: Heart Attack**

Nartey re-alleges and incorporates by reference paragraphs 1 - 95 inclusive in Franciscan's August 3, 2016 **FAILURE TO** STABALIZE EMERGENT / ACUTE LIFE-THREATENING HEALTH CONDITION OF **NON-STEMI / HEART ATTACK**.

Section 42 CFR 489.24(b) defines "stabilized" to mean that the treatment the individual receives for their emergency medical condition makes it so that "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility or with respect to "an emergency medical condition."

Common stabilization services for heart attack include, but are not limited to, carotid endarterectomy, laser therapy, carotid angioplasty, and stenting since these methods have all been documented as highly effective medical methods of (a) halting post-heart attack damage to the heart muscle and (b) ensuring with reasonable medical certainty that no decline will result from the discharge of transfer of the individual experiencing the emergency medical condition even if a related or underlying health condition persists.

Franciscan never alerted Millicent, Nartey, or any family members that its test results raised concerns about a heart attack nor did they discuss treatment options, including all types, risks, and benefits as required by patient rights laws, with Millicent, Nartey, or the family. Yet a NON-STEMI is noted as one of the conditions observed Millicent's emergency room records.

**COUNT SEVEN: EMTALA VIOLATION 42 USC 1395 dd**

**8/3/16 FAILURE TO STABILIZE re: ISCHEMIC STROKE**

Nartey re-alleges and incorporates by reference paragraphs 1 - 95 inclusive in Franciscan's August 3, 2016 **FAILURE TO** STABALIZE EMERGENT / ACUTE LIFE-THREATENING HEALTH CONDITION OF **ISCHEMIC STROKE**

August 3, 2016 Franciscan medical records state that Millicent was on "stroke alert" and was noted as "rapid decline" but Franciscan's emergency medical team declined to execute the recommended MRI which would have allowed them to select the most appropriate medical method for stabilization.

Section 42 CFR 489.24(b) defines "stabilized" to mean that the treatment the individual receives for their emergency medical condition makes it so that "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility or with respect to "an emergency medical condition."

Common stabilization services for ischemic stroke in August 2016 included, but were not limited to, tissue plasminogen activator (only applicable in less than 25% of ischemic stroke cases); endovascular therapy (made the priority treatment option for stroke patients with large vessel occlusion by the AHA in 2015), carotid endarterectomy, and the medical transfer of the stroke patient to a primary or comprehensive stroke center that could deliver all both common and advanced medical care, including the use of technologies and neurosurgical expertise, to (a) halt brain tissue damage post-stroke; (b) restore oxygen delivery and blood flow to brain tissue thereby minimalizing disability and decline including damage to the brain stem; and (c) ensure with reasonable medical certainty that no decline will result from the discharge or transfer of the individual experiencing the emergency medical condition even if a related or underlying health condition persists.

## COUNT EIGHT: EMTALA VIOLATION 42 USC 1395 dd
## 8/4/16 FAILURE TO STABILIZE re: ISCHEMIC STROKE

Nartey re-alleges and incorporates by reference paragraphs 1 - 95 inclusive in Franciscan's August 4, 2016 **FAILURE TO** STABALIZE EMERGENT / ACUTE LIFE-THREATENING HEALTH CONDITION OF **ISCHEMIC STROKE**

Franciscan informed Millicent, Nartey, and family on August 3, 2016 that Millicent was being kept on-site for observation purposes only, but would be moved to Franciscan's ICU for additional services. On August 4, 2016 – during the understood observation period – Franciscan obtained the results of their second CT scan, which showed changes in brain tissue consistent with ischemic stroke, yet did not implement Franciscan medical records state that Millicent was on "stroke alert" and was noted as "rapid decline" but Franciscan's emergency medical team declined to execute the recommended MRI which would have allowed them to select the most appropriate medical method for stabilization.

Section 42 CFR 489.24(b) defines "stabilized" to mean that the treatment the individual receives for their emergency medical condition makes it so that "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility or with respect to "an emergency medical condition."

Common stabilization services for ischemic stroke in August 2016 included, but were not limited to, tissue plasminogen activator (only applicable in less than 25% of ischemic stroke cases); endovascular therapy (made the priority treatment option for stroke patients with large vessel occlusion by the AHA in 2015), carotid endarterectomy, and the medical transfer of the stroke patient to a primary or comprehensive stroke center that could deliver all both common and advanced medical care, including the use of technologies and neurosurgical expertise, to

(a) halt brain tissue damage post-stroke; (b) restore oxygen delivery and blood flow to brain tissue thereby minimalizing disability and decline including damage to the brain stem; and (c) ensure with reasonable medical certainty that no decline will result from the discharge or transfer of the individual experiencing the emergency medical condition even if a related or underlying health condition persists.

## COUNT NINE: EMTALA VIOLATION 42 USC 1395 dd
## 8/5/16 FAILURE TO STABILIZE re: ISCHEMIC STROKE

Nartey re-alleges and incorporates by reference paragraphs 1 - 95 inclusive in Franciscan's August 5, 2016 **FAILURE TO** STABALIZE EMERGENT / ACUTE LIFE-THREATENING HEALTH CONDITION OF **ISCHEMIC STROKE**

On 8/5/16 Franciscan finally performed the MRI that was recommended on 8/3/16 by the emergency medical team. Even though Illinois' laws regarding stroke care mandate that an acute stroke ready hospital respond quickly (including a medical transfer) to the results of brain imaging and blood coagulation tests regarding stroke to stabilize the individual, Franciscan took such action to stabilize Millicent for the emergency medical condition revealed by the 8/5/16 MRI: ischemic stroke with large vessel occlusion.

Franciscan's response to the 8/5/16 MRI is considered part of its EMTALA violation sine the MRI was recommended for completion on 8/3/16.

Section 42 CFR 489.24(b) defines "stabilized" to mean that the treatment the individual receives for their emergency medical condition makes it so that "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility or with respect to "an emergency medical condition."

Common stabilization services for ischemic stroke in August 2016 included, but were not limited to, tissue plasminogen activator (only applicable in less than 25% of ischemic stroke cases); endovascular therapy (made the priority treatment option for stroke patients with large vessel occlusion by the AHA in 2015), carotid endarterectomy, and the medical transfer of the stroke patient to a primary or comprehensive stroke center that could deliver all both common and advanced medical care, including the use of technologies and neurosurgical expertise, to (a) halt brain tissue damage post-stroke; (b) restore oxygen delivery and blood flow to brain tissue thereby minimalizing disability and decline including damage to the brain stem; and (c) ensure with reasonable medical certainty that no decline will result from the discharge or transfer of the individual experiencing the emergency medical condition even if a related or underlying health condition persists.

This failure is especially egregious since Franciscan Health emergency room medical records show that a stroke alert was activated and that as an acute stroke ready hospital, Franciscan Health is obligated – under 210 ICLS 50 – to ensure individuals presenting with stroke have immediate access to such therapies, whether on-site or via medical transfer to a comprehensive stroke center or even a primary stroke center. Millicent and  Nartey both suffered damages as a result of these violations.

**COUNT TEN:**

**8/3/16 FAILURE TO INITIATE HOSPITAL TRANSFER TO ENSURE PROPER EXAM**

 Nartey re-alleges and incorporates by reference paragraphs 1 - 95 inclusive in Franciscan's August 3, 2016 **FAILURE TO INITIATE HOSPTIAL TRANSFER FOR FURTHER EXAMINATION AND** STABALIZATION OF THE EMERGENT / ACUTE LIFE-THREATENING HEALTH CONDITION OF **STROKE.**

This failure is especially egregious since on 8/3/16 Franciscan's emergency room records noted Millicent as having an "altered mental state" and 'RAPID DECLINE.' With this

information as an acute stroke ready hospital, Franciscan Health was obligated – under 210 ICLS 50 which supports the EMTALA mandate– to use their written hospital transfer agreement with a primary stroke center or comprehensive stroke center (which was also required under 210 ILCS 50) to deliver Millicent's required access to the technologies and expertise available to further exam her for and stabilize the life-threatening emergency medical condition of stroke.

This failure is also especially egregious since the hospitals that Nartey selected when Franciscan finally allowed the Nartey family to complete a written transfer request (seven days after she presented at Franciscan's emergency department):

    (a) happened to be comprehensive stroke centers

    (b) accepted Millicent for hospital transfer despite the decline in her condition compared to her state on August 3, 2016

    (c) later declined / reversed their admission of Millicent for insurance / financial reasons, as noted in Franciscan medical records.

    (d) Would have accepted Millicent for examination and stabilization per EMTALA guidelines had the transfer request been submitted prior to Franciscan giving Millicent inpatient status due to the need to stabilize Millicent's life-threatening emergency medical condition of ischemic stroke using their specialized facilities and highly-skilled personnel.

Millicent, Nartey, and the Millicent's surviving heirs connected to the Estate of Millicent Nartey all suffered damages as a result of these violations.

## COUNT ELEVEN:

### 8/4/16 FAILURE TO INITIATE HOSPITAL TRANSFER TO ENSURE STABILAZION

Nartey re-alleges and incorporates by reference paragraphs 1 - 95 inclusive in Franciscan's August 4, 2016 **FAILURE TO INITIATE HOSPTIAL TRANSFER FOR**

**STABALIZATION** OF THE EMERGENT / ACUTE LIFE-THREATENING HEALTH CONDITION OF **STROKE.**

This failure is especially egregious since, per Franciscan medical staff's verbal communication with the family, Millicent yet an inpatient on 8/4/16 when the second CT scan – which they reported showed significant brain tissue changes consistent with ischemic stroke - was completed.

With this information as an acute stroke ready hospital, Franciscan Health was obligated – under 210 ICLS 50 which supports the EMTALA mandate – to use their written hospital transfer agreement with a primary stroke center or comprehensive stroke center (which was also required under 210 ILCS 50 & supported by EMTALA) to deliver Millicent's required access to the technologies and expertise available to further exam her for and stabilize the life-threatening emergency medical condition of stroke.

This failure is also especially egregious since the hospitals that Nartey selected when Franciscan finally allowed the Nartey family to complete a written transfer request (seven days after she presented at Franciscan's emergency department):

(a) happened to be comprehensive stroke centers

(b) accepted Millicent for hospital transfer despite the decline in her condition compared to her state on August 3, 2016

(c) later declined / reversed their admission of Millicent for insurance / financial reasons, as noted in Franciscan medical records.

(d) Would have accepted Millicent for examination and stabilization per EMTALA guidelines had the transfer request been submitted prior to Franciscan giving Millicent inpatient status due to the need to stabilize Millicent's life-threatening emergency medical condition of ischemic stroke using their specialized facilities and highly-skilled personnel.

Millicent, Nartey, and the Millicent's surviving heirs connected to the Estate of Millicent Nartey all suffered damages as a result of these violations.

## COUNT TWELVE:

### 8/5/16 FAILURE TO INITIATE HOSPITAL TRANSFER TO ENSURE STABILATION

Nartey re-alleges and incorporates by reference paragraphs 1 - 95 inclusive in Franciscan's August 5, 2016 **FAILURE TO INITIATE HOSPTIAL TRANSFER FOR STABALIZATION** OF THE EMERGENT / ACUTE LIFE-THREATENING HEALTH CONDITION OF **STROKE.**

This failure is especially egregious since, per Franciscan medical staff's verbal communication with the family, Millicent was not yet an inpatient on 8/4/16 when the second CT scan – which they reported showed significant brain tissue changes consistent with ischemic stroke - was completed and an MRI was ordered. Yet Franciscan did not complete the MRI prior to their decision to assign Millicent inpatient status at Franciscan as is supported by both EMTALA & 210 ILCS 50.

With this information as an acute stroke ready hospital, Franciscan Health was obligated – under 210 ICLS 50 which supports the EMTALA mandate – to use their written hospital transfer agreement with a primary stroke center or comprehensive stroke center (which was also required under 210 ILCS 50 & supported by EMTALA) to deliver Millicent's required access to the technologies and expertise available to further examine Millicent for and stabilize the life-threatening emergency medical condition of stroke.

This failure is also especially egregious since the hospitals that Nartey selected when Franciscan finally allowed the Nartey family to complete a written transfer request (seven days after she presented at Franciscan's emergency department):

    (a) happened to be comprehensive stroke centers

    (b) accepted Millicent for hospital transfer despite the decline in her condition compared to her state on August 3, 2016

    (c) later declined / reversed their admission of Millicent for insurance / financial reasons, as noted in Franciscan medical records.

    (d) Would have accepted Millicent for examination and stabilization per EMTALA guidelines had the transfer request been submitted prior to Franciscan giving Millicent inpatient status due to the need to stabilize Millicent's life-threatening emergency medical condition of ischemic stroke using their specialized facilities and highly-skilled personnel.

Millicent, Nartey, and the Millicent's surviving heirs connected to the Estate of Millicent Nartey all suffered damages as a result of these violations.


**COUNT THIRTEEN:**

**8/4/16 FAILURE TO INITIATE HOSPITAL TRANSFER AT THE REQUEST OF THE PATIENT/**

    When Millicent's husband, Maxwell, made Millicent's desire to seek care elsewhere known on 8/4/16, he was instructed to be patient with the assessment process since this medical emergency was of the scope of his expertise. Franciscan did not present, as per Medical Patient's Right's Laws and EMTALTA, any information – written or verbal – regarding dangers of discharge against medical advice, locations for outpatient care, or locations to continue exam and care for Millicent's identified and suspected medical emergencies.


COUNT FOURTEEN:

8/5/16 FAILURE TO INITIATE HOSPITAL TRANSFER AT THE REQUEST OF THE PATIENT/

When Millicent made her desire to leave Franciscan Health known by saying "I want to go home" on 8/5/16, neither the nurse present or any of the Franciscan medical staff consulted on this issue that day advised of transfer options or ASRH status

Franciscan did not present, as per Medical Patient's Right's Laws and EMTALTA, any information – written or verbal – regarding dangers of discharge against medical advice, locations for outpatient care, or locations to continue exam and care for Millicent's identified and suspected medical emergencies.

**COUNT FIFTEEN:**

8/6/16 FAILURE TO INITIATE HOSPITAL TRANSFER AT THE REQUEST OF THE

PATIENT'S REPRESENTATIVE

When the Franciscan neurologist revealed Millicent's emergency medical condition to Millicent (unconscious), Nartey, and Rosalita on 8/6/16 he did not alert the family that Millicent's diagnosis of emergency medical condition with large vessel occlusion required care was beyond the scope Franciscan's capabilities, technologies, and expertise as an acute stroke ready hospital.

Franciscan's neurologist did not advise Millicent, by way of her representatives present, that there were primary stroke centers and comprehensive stroke centers in the region that did in fact have the life-saving technology and expertise available to stabilize Millicent's emergency medical condition of ischemic stroke with large vessel occlusion.

The Franciscan neurologist also did not advise Millicent by way of her representatives that she was entitled – per EMTALA – to request a hospital transfer and gain access to this life-saving medical care for her emergency medical condition even though the Franciscan medical team on duty, had not yet initiated the transfer since obtaining her MRI results.

Franciscan did not present, as per Medical Patient's Right's Laws and EMTALTA, any information – written or verbal – regarding dangers of discharge against medical advice, locations for outpatient care, or locations to continue exam and care for Millicent's identified and suspected medical emergencies.

Per EMTALA, a hospital's EMTALA obligations do not end if a patient is assigned inpatient status in bad faith. Millicent, Nartey, the surviving heirs connected to Millicent's estate did all suffer damages as a result of this EMTALA violation.

COUNT FOURTEEN:

8/6/16 FAILURE TO INITIATE HOSPITAL TRANSFER AT THE REQUEST OF THE PATIENT/

**COUNT FIFTEEN: VIOLATION OF EMTALA VIA ADMISSION IN BAD FAITH**

**8/4 they told us they were admitting mom after the CT scan showed changes consistent with ischemic stroke, but Franciscan did not advise that as an acute stroke ready hospital this location did not have the technology or expertise available to successfully stabilize an individual with the emergency medical condition of ischemic stroke**

**COUNT SIXTEEN: VIOLATION OF EMTALA VIA ADMISSION IN BAD FAITH**

**8/3 medical records are inconsistent with what the family was told and state that Millicent was transferred to inpatient status on 8/3/16. Even if Franciscan would like to stand by this admission date, bad faith still stands because as an ASRH Franciscan was obligated to transfer.**

**COUNT SEVENTEEN: VIOLATION OF TITLE VI CIVIL RIGHTS ACT OF 1964 ACCOMODATIONS FOR INDIVIDUAL WITH LIMITED ENGLISH PROFIENCY**

Nartey re-alleges and incorporates by reference paragraphs 1 - 95 inclusive in Franciscan's August 3, 2016 VIOLATION OF CIVIL RIGHTS ACT OF 1964 VIA THEIR **FAILURE TO PROVIDE ACCOMODATION FOR INDIVIDUAL WITH LIMITED ENGLISH PROFIENCY**.  45 CFR 80.3 – Purpose is to effectuate Title VI of Civil Rights Act of 1964 … No person shall be denied any service or provided service that is different …

Per Title VI of the Civil Rights Act of 1964, recipients, like Franciscan Health, of Federal financial assistance, such as Medicaid/Medicare, are required to take reasonable steps to make their programs, services, and activities by eligible persons with limited English proficiency. This failure is especially egregious since (1) Franciscan Health receives federal financial assistance and is therefore subject to CIVIL RIGHTS ACT OF 1964 and (2) the denial or omission of the limited English profiency accommodations prevented Millicent Nartey from

giving informed consent.  Millicent Nartey and Nartey both suffered damages as a result of these violations.

<b>COUNT EIGHTEEN: EMTALA VIOLATION 42 USC 1395 dd</b>
<b>8/3/16 FAILURE TO STABILIZE re: ISCHEMIC STROKE</b>

Nartey re-alleges and incorporates by reference paragraphs 1 - 95 inclusive in Franciscan's August 3, 2016 VIOLATION OF CIVIL RIGHTS ACT OF 1964 VIA THEIR **FRAUDULENT CONCEALMENT of their status as an acute stroke center hospital and its corresponding obligations for the transfer of individuals under stroke alert or individuals experience stoke to a COMPREHENSIVE STROKE CENTER OR PRIMARY STROKE CENTER FOR STABILIZATION AND CARE.**

45 CFR 80.3 – Purpose is to effectuate Title VI of Civil Rights Act of 1964 … No person shall be denied any service or provided service that is different …

Per <u>Title VI</u> of the Civil Rights Act of 1964, recipients, like Franciscan Health, of Federal financial assistance, such as Medicaid/Medicare, are required to ensure that all individuals presenting receive the same options and care for identical conditions. This failure is especially egregious since Millicent Nartey did not receive the care options that she was entitled to under 210 ICLS 50, which governs Franciscan Health's ability to remain licensed in Illinois as an acute stroke ready hospital, and suffered extensively as a result. Millicent Nartey and Nartey both suffered damages as a result of these violations.

**COUNT NINETEEN: VIOLATION OF PUBLIC HEALTH ACT**

PUBLIC HEALTH ACT VIOLATINS WHICH COMPOUND EMTALA VIOLATIONS

1. Discharge planning in writing
2. On-going review of discharge plan and the provision of updated discharge plans to the patient or the patient's appointed representative.

3. Record of all discharge plans not provided upon request in patient's medical records.
4. Record of patient's imaging test results, anesthesia experience, and more not provided upon request in medical records.
5. Failure to transfer said patient to a more skilled facility for identified health conditions and medical emergencies would result in patient harm, disability, or death, as mandated by PUBLIC HEALTH ACT.

**COUNT TWENTY: VIOLATION OF HIPPA WHICH AGGREVATES EMTALA VIOLATIONS**

In January 2019, during the proceedings of initial EMTALA complaint, Nartey discovered that Franciscan's withholding of diagnosis, treatment options, & treatment risks prevented the Nartey family from communicating the same with Millicent Nartey in the native language and violated her right – guaranteed by HIPPA & the Civil Rights Act – to have access to a translator in medical settings.

1. Record of all discharge plans not provided upon request in patient's medical records.
2. Record of anesthesia use not provided upon request in patient's medical records.
3. Record of patient's imaging test results, anesthesia experience, and more not provided upon request in medical records.

**COUNT TWENTY ONE: VIOLATION OF HIPPA WHICH AGGREVATES EMTALA**

**COUNT TWENTY TWENTY TWO: EMTALA VIOLATIONS BY WAY OF NEGLIGENCE & MEDICAL BATTERY**

This Court has supplemental jurisdiction over negligence claims under 42 USC 1367. Plaintiff alleges that some or all of the EMTALA violations listed thus far were the result of the negligence of key parties on Millicent's Franciscan care team, selected by Franciscan Health Olympia Fields. Alleged offending parties include, but are not limited to:

Cardiologist –

Neurologist –

Lead Doctor –

ER doctor –

Anesthesiologist –

Stroke Alert Clinician -

While formal charges will be brought against all those identified via the affidavit of merit, once Franciscan provides the missing portions of Millicent's medical records, including – but not limited to – CT scan results, MRI results, anesthesia reports, hospital transfer requests, etc.

```
WHEREFORE Isabella Nartey - plaintiff, pro se - prays that the court
grant her relief for the aforementioned claims and submits this
complaint with a jury trial demand.
```

DATED

February 26, 2019


      /s/ Isabella Nartey


_____

Signature: Isabella Nartey, Pro Se, Plaintiff

ISABELLA NARTEY
P.O. Box 1184
Chicago Heights, IL
(312) 725-3534
ourmillicent@gmail.com

Self-Represented

CERTIFICTATE OF SERVICE

I hereby certify that I – Isabella Nartey, pro se plaintiff – sent this motion for leave to file amended complaint to all leading attorneys listed for defendant's counsel – Bradford D. Roth, Robert H. Summers, Jr., and Andrew J. Holmstrom – by email (broth@cassiday.com, rsummer@cassiday.com, aholmstrom@cassiday.com).

I certify under penalty of perjury that the foregoing is true and correct.

Executed on February 26, 2019

     /s/ Isabella Nartey

_____

Signature:  Isabella Nartey, Pro Se, Plaintiff